FILED

2025 Feb-27  AM 11:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

CHRISTOPHER GARGUS,      )
     )
     Plaintiff,      )
     )
     v.      )      Case No. 2:23-cv-01570-NAD
     )
SOCIAL SECURITY      )
ADMINISTRATION,      )
COMMISSIONER,      )
     )
     Defendant.      )

## MEMORANDUM OPINION AND ORDER
## **AFFIRMING THE DECISION OF THE COMMISSIONER**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Christopher Gargus appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits. Doc. 1. Plaintiff Gargus applied for benefits with an alleged onset date of January 21, 2021. Doc. 7-6 at 4–15. The Commissioner denied Gargus's claim for benefits. Doc. 7-3 at 2–6, 8–21. In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 10; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUE FOR REVIEW

In this appeal, Gargus argues that the Administrative Law Judge (ALJ) failed

1

to properly evaluate the credibility of Gargus's subjective testimony under the Eleventh Circuit "pain standard," such that substantial evidence does not support the ALJ's determination that Gargus could perform a range of medium work.  Doc. 13 at 5–11.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:   (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1)    whether the claimant is engaged in substantial gainful activity;

(2)    if not, whether the claimant has a severe impairment or combination of impairments;

(3)    if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)    if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and,

(5)    if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to

show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the

4

Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.**    With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. And the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## BACKGROUND

### A.    Gargus's personal and medical history

Gargus was born on May 1, 1964. Doc. 7-4 at 2; Doc. 7-6 at 4, 8. Gargus previously

worked multiple contracting laborer jobs through 2020.  Doc. 7-7 at 2.

On March 11, 2020, Gargus saw Dr. David Wilson, a primary care provider, for hypertension.  Doc. 7-9 at 25.  His blood pressure was 182/102.  Doc. 7-9 at 25.  Dr. Wilson noted a history of osteoarthritis and essential hypertension.  Doc. 7-9 at 25.  Gargus was not taking any medication for his blood pressure and was prescribed Lisinopril.  Doc. 7-9 at 26.  He had no pain, no shortness of breath, and no exercise intolerance.  Doc. 7-9 at 26.

On March 18, 2020, Gargus saw Dr. Wilson for a follow-up for essential hypertension.  Doc. 7-9 at 23.  His blood pressure was "barely better," and Gargus reported that he "[f]elt okay yesterday morning, but has hit a crash with the way he is feeling since after lunch yesterday."  Doc. 7-9 at 24.  Gargus reported no exercise intolerance or shortness of breath.  Doc. 7-9 at 24.

On May 4, 2020, Gargus reported to the Emergency Department at St. Vincent's Blount Hospital due to dropping blood pressure.  Doc. 7-8 at 12.  He was discharged with a diagnosis of chest pain, dizziness, elevated liver function tests, low sodium, and low blood pressure, and was given saline, recommended to reduce his water intake, and sent home.  Doc. 7-8 at 15–34.  Gargus reported at that visit that he had been experiencing intermittent chest pain for "the past couple months."  Doc. 7-8 at 18.  His chart notes that his liver function issues were potentially related to alcohol intake.  Doc. 7-8 at 20.

On May 7, 2020, Gargus saw Dr. Wilson for a follow-up for his essential hypertension, during which he complained that his blood pressure had been "running low" and that he had been experiencing weakness. Doc. 7-9 at 21. Gargus was told to continue taking Lisinopril and to discontinue other medication. Doc. 7-9 at 22.

On May 29, 2020, Gargus saw Dr. Wilson for a follow-up for essential hypertension. Doc. 7-9 at 19–20. His blood pressure was elevated. Doc. 7-9 at 20. Gargus stated that he was "doing ok" but had "no energy at all." Doc. 7-9 at 20.

On June 5, 2020, Gargus saw Dr. Wilson for a lab result follow-up. Doc. 7-9 at 18. His blood pressure was 130/78. Doc. 7-9 at 18. Gargus's liver enzymes were concerningly high and he was told to stop drinking alcohol. Doc. 7-9 at 18–19.

On June 10, 2020, Gargus had an abdominal ultrasound due to elevated lab results; the results of the ultrasound were normal. Doc. 7-8 at 11.

On June 17, 2020, Gargus saw Dr. Wilson for a review of his liver function. Doc. 7-9 at 16. His blood pressure was 128/82. Doc. 7-9 at 16. Dr. Wilson noted that Gargus's liver enzymes were "dangerously high," and that Gargus needed to stop drinking alcohol. Doc. 7-9 at 17. Gargus reported no exercise intolerance and no shortness of breath when walking. Doc. 7-9 at 17.

On July 29, 2020, Gargus saw Dr. Wilson for a follow-up for essential hypertension. Doc. 7-9 at 14–15. His blood pressure was 140/90, and he had no other acute symptoms. Doc. 7-9 at 15–16.

On September 30, 2020, Gargus saw Dr. Wilson for a follow-up for essential hypertension.  Doc. 7-9 at 13.  His blood pressure was 130/72, and he reported no pain but said that his blood pressure was "elevated at home on occasion."  Doc. 7-9 at 13–14.  Gargus stated that he had "pressure in his chest every now and again" that did not seem to be related to exertion, and no shortness of breath.  Doc. 7-9 at 14.  Gargus requested a referral to a cardiologist.  Doc. 7-9 at 14.  He had no acute symptoms at the time of the appointment.  Doc. 7-9 at 14.

On October 20, 2020, Gargus saw Dr. Van Reeder, Jr., a cardiologist, for a new patient consult.  Doc. 7-8 at 69.  Gargus had a normal EKG, but reported that he had experienced chest pain and pressure for days and did not "have enough energy to do much."  Doc. 7-8 at 69.  Gargus told Dr. Reeder that, "[b]y the time I walk out to my truck, I will . . . give out."  Doc. 7-8 at 69.  Gargus told Dr. Reeder that he had started taking Lisinopril in March and had been "having trouble" since then.  Doc. 7-8 at 69.  Gargus reported drinking 5 beers per day.  Doc. 7-8 at 70.  He reported fatigue, chest pain, palpitations, dyspnea on exertion, lightheadedness, and shortness of breath, but denied other symptoms.  Doc. 7-8 at 70.  His physical examination was normal.  Doc. 7-8 at 70.  Dr. Reeder recommended that Gargus go to the hospital for angiographic evaluation.  Doc. 7-8 at 71.  Dr. Reeder also recommended "[s]ymptom-limited activity."  Doc. 7-8 at 71.

On October 21, 2020, Gargus presented to the Emergency Department at St.

8

Vincent's East Hospital with chest pain and was admitted.  Doc. 7-8 at 50–68, 72–76.  Gargus reported that he had been experiencing chest pain "off and on" for 3 to 4 days and had severe fatigue; the degree of his pain was "moderate" and at a 4 out of 10.  Doc. 7-8 at 55, 68.  Gargus reported drinking 2 beers per night.  Doc. 7-8 at 56.  His physical examination was largely normal and his condition was stable.  Doc. 7-8 at 56–57, 72.  He had active hypertension.  Doc. 7-8 at 67.  Radiology revealed some mild nonobstructive coronary artery disease but was otherwise normal.  Doc. 7-8 at 98–100.

On November 6, 2020, Gargus saw Dr. Wilson for a follow-up for his hypertension.  Doc. 7-9 at 9–11.  Dr. Wilson noted that Gargus suffered from hypertensive disorder with essential hypertension with an onset date of March 11, 2020, osteoarthritis, raised prostate antigens, and elevated liver enzymes.  Doc. 7-9 at 9, 11.  Gargus's blood pressure was 120/72.  Doc. 7-9 at 12.  Gargus reported that he was still suffering from chest pain some days, and that he was not taking Lipitor because of his drinking; Dr. Wilson encouraged Gargus to try to stop alcohol intake.  Doc. 7-9 at 12.  Gargus reported no current chest pain, no shortness of breath when walking, and no other acute symptoms.  Doc. 7-9 at 12.

On November 24, 2020, Gargus returned to Dr. Reeder for a follow-up.  Doc. 7-9 at 53.  Dr. Reeder noted that Gargus was "in his usual state of health" and had "been relatively active," though he did not exercise routinely.  Doc. 7-9 at 53.

Gargus reported that he still experienced extreme fatigue, weakness, and some chest pain.  Doc. 7-9 at 53.  Gargus reported drinking 5 beers per day.  Doc. 7-9 at 53. Gargus's physical exam was normal.  Doc. 7-9 at 54.  Gargus asked for Dr. Reeder to cancel a scheduled stress test.  Doc. 7-9 at 55.

On April 12, 2021, Gargus filled out an adult function report.  Doc. 7-7 at 34– 41.  In his function report, Gargus stated that he lived in an apartment with his mother, and that his conditions limited his ability to work because he had chest pain and no energy.  Doc. 7-7 at 34.  Gargus reported that he spent most of his time sitting and watching television or listening to music, that he did not take care of anyone or any animals, that he was always tired, and that he had no difficulties with personal care.  Doc. 7-7 at 35–36.  He stated that he sometimes needed reminders to take medication, that his mother prepared all his meals, and that his mother took care of all chores.  Doc. 7-7 at 36.  Gargus stated that he could drive a car and go out by himself, but did not do any shopping, and that his mother took care of his finances. Doc. 7-7 at 37.  He stated that he socialized, but not often because he did not have any energy.  Doc. 7-7 at 38.  He stated that, because of his lack of energy, he had trouble walking, climbing stairs, and completing tasks, and could only walk 20 yards before needing to rest.  Doc. 7-7 at 39.  Gargus stated that he took medication for blood pressure and heartburn.  Doc. 7-7 ay 42.

On May 25, 2021, Gargus returned to see Dr. Wilson for a follow-up.  Doc.

7-9 at 50.  His blood pressure was "acceptable" both at the appointment and at home, and Gargus reported that he was "as active as he can be."  Doc. 7-9 at 50.

On June 21, 2021, Dr. Alvin Tenchavez performed a disability determination examination of Gargus.  Doc. 7-9 at 65.  Dr. Tenchavez noted Gargus's history of hypertension and arthritis affecting his hands, knees, and back, and stated that Gargus reported feeling fatigue since he stopped working in March 2020.  Doc. 7-9 at 65.  Gargus denied shortness of breath, including with exertion, but said he experienced chest pain with exertion.  Doc. 7-9 at 66.  His physical exam was normal.  Doc. 7-9 at 67–70.  Dr. Tenchavez diagnosed Gargus with hypertension, arthralgia, hyperlipidemia, gastroesophageal reflux disease, fatigue by history, and alcoholism.  Doc. 7-9 at 68.

On July 28, 2021, Gargus saw Dr. Wilson for a blood pressure check and fatigue.  Doc. 7-10 at 20.  Gargus reported that his blood pressure had been running high and was at 150/94 the night before, that he got out of breath walking to his mailbox, and that he had no energy.  Doc. 7-10 at 20.  His blood pressure was 124/66 at his appointment.  Doc. 7-10 at 20.  Gargus stated that he got short of breath when he walked "very far," but that he had never had shortness of breath while sitting.  Doc. 7-10 at 21.  Gargus was diagnosed with chronic obstructive pulmonary disease (COPD) and prescribed steroids and an inhaler.  Doc. 7-10 at 21–22.

On August 11, 2021, Gargus saw Dr. Wilson for a follow-up for COPD.  Doc.

7-10 at 17.  Gargus reported some wheezing and fatigue, and Dr. Wilson ordered labs.  Doc. 7-10 at 19.

On August 17, 2021, Gargus saw Dr. Wilson for a lab results follow-up.  Doc. 7-10 at 13.  His blood pressure was 114/64.  Doc. 7-10 at 13.  Gargus's labs had slightly improved, but Dr. Wilson encouraged him to "leave off alcohol all together." Doc. 7-10 at 15.  Gargus reported no fatigue, shortness of breath, weakness, or chest pain.  Doc. 7-10 at 15.

On June 30, 2022, Gargus presented to the Emergency Department at St. Vincent's Blount Hospital for a bee sting.  Doc. 7-10 at 31.  His blood pressure was elevated, but he did not report chronic illness and reported no symptoms other than those related to the bee sting; he was discharged in stable condition.  Doc. 7-10 at 31–33.

## B.    Social Security proceedings

### 1.    Initial application and denial of benefits

On March 15, 2021, Gargus applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) with an alleged onset date of January 21, 2021.  Doc. 7-6 at 4–15.  Gargus alleged disability due to high blood pressure, arthritis, fatigue, and acid reflux.  Doc. 7-7 at 22.

On July 22, 2021, Gargus's applications for benefits were denied at the initial level based on a finding that Gargus was not disabled because he could perform work

at a medium level.  Doc. 7-4 at 2–15.

Gargus requested reconsideration of the initial denials of his applications for benefits.  Doc. 7-5 at 17.  On February 17, 2022, Gargus's applications were denied at the reconsideration level.  Doc. 7-3 at 16–31.

On February 28, 2022, Gargus requested a hearing with an ALJ (Doc. 7-5 at 126), and a telephonic hearing was held on September 12, 2022 (Doc. 7-3 at 34–36).

On March 30, 2023, the ALJ entered an unfavorable decision.  Doc. 7-3 at 8–21.

### 2.    ALJ hearing

On September 12, 2022, the ALJ held a telephonic hearing on Gargus's applications for disability benefits.  Doc. 7-3 at 34–36.

During the hearing, Gargus testified that he has not worked since January 21, 2021, his alleged onset date, because his "blood pressure was so high that [his] employer said come back when it's fixed."  Doc. 7-3 at 40.  Gargus testified that he could not do the type of work he had done in the past because he "just [has] no energy and he just [does not] feel good."  Doc. 7-3 at 40.  He said that he did not have pain, but had primarily fatigue and weakness that he experienced daily.  Doc. 7-3 at 41.  Gargus testified that he could not walk to the mailbox and back—a distance of about 30 yards—without having to stop and rest.  Doc. 7-3 at 41.  Gargus testified that he could stand for about 10 to 15 minutes before having to rest, and that

he could not "lift and carry" a gallon of milk throughout the day.  Doc. 7-3 at 41–42.  Gargus testified that he sometimes got restless while sitting and had to "get up and move for a minute" and then sit back down, and that he had to rest for "at least three hours or so" per day due to lack of energy.  Doc. 7-3 at 42.  He testified that "resting" included sitting, reclining, and lying down.  Doc. 7-3 at 42.

Gargus testified that he lived with his mother and was able to "run the microwave" and "cook a little bit" if he had a chair in the kitchen.  Doc. 7-3 at 42.  He testified that he spent his time during the day watching television and playing on his phone.  Doc. 7-3 at 42.  Gargus testified that he was not receiving any type of medical treatment and did not have medical insurance.  Doc. 7-3 at 43.  Gargus testified that he could not do his previous work because he "couldn't work the ten hours" as it was "all physical," and that his fatigue and weakness were the primary symptoms that affected his ability to work.  Doc. 7-3 at 43.

Upon questioning from the ALJ, Gargus testified that his blood pressure had been a problem since March 2020, and that he took blood pressure medication every day and monitored his blood pressure.  Doc. 7-3 at 44–45.  He testified that his blood pressure was usually about 130/85.  Doc. 7-3 at 45.

On January 25, 2023, the ALJ held a supplemental hearing, in part to hear testimony from a vocational expert (VE).  Doc. 7-3 at 48–49.  Gargus testified that nothing about his condition had "significantly changed" since the previous hearing,

14

and that he had "good days, bad days."  Doc. 7-3 at 53.  Gargus reiterated that he

could not do 10 hours of physical labor, as his previous jobs had required, and that

he did not have the energy to stay on his feet or walk much.  Doc. 7-3 at 53.  Gargus

testified that he could comfortably lift about 15 to 20 pounds.  Doc. 7-3 at 54.

Vocational expert (VE) William Starke then testified that a hypothetical

individual with Gargus's age, education, work experience, and RFC (residual

functional capacity) would not be able to perform Gargus's past relevant work.  Doc.

7-3 at 55, 58.  VE Starke testified that such a hypothetical individual with the

limitations posed by the ALJ could perform jobs classified as medium work that

exist in significant numbers in the national economy, including hand packager,

machine packager, and porter.  Doc. 7-3 at 56.

### 3.    ALJ decision

On March 30, 2023, the ALJ entered an unfavorable decision.  Doc. 7-3 at 8–

21.  In the decision, the ALJ found that Gargus met the requirements for insured

status through December 31, 2025.  Doc. 7-3 at 12.  "After careful consideration of

all the evidence," the ALJ concluded that Gargus "has not been under a disability

within the meaning of the Social Security Act from January 21, 2021, through the

date of this decision."  Doc. 7-3 at 12.

The ALJ applied the five-part sequential test for disability.  Doc. 7-3 at 12–

13; *see* 20 C.F.R. 20 C.F.R. §§ 404.1520(a), 416.920(a); *Winschel*, 631 F.3d at 1178.

The ALJ found that Gargus was insured through December 31, 2025, that he had not engaged in substantial gainful activity since his alleged onset date of January 21, 2021, and that Gargus had severe impairments of "history of atherosclerotic heart disease and native coronary artery without angina pectoris and chronic obstructive pulmonary disease."  Doc. 7-3 at 13–14.  The ALJ found that Gargus had non-severe impairments of gastroesophageal reflux disease, alcoholism, arthralgia, hyperlipidemia, and essential hypertension.  Doc. 7-3 at 14.  The ALJ found that Gargus did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations.  Doc. 7-3 at 14.

The ALJ determined Gargus's RFC (or residual functional capacity), finding "after careful consideration of the entire record" that Gargus could "perform medium work," except that he could "never be exposed to pulmonary irritants or unprotected heights, and he cannot operate hazardous machinery."  Doc. 7-3 at 13, 15.  The ALJ stated that the ALJ had considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  Doc. 7-3 at 15.  The ALJ also stated that the ALJ had considered any medical opinions and prior administrative medical findings.  Doc. 7-3 at 15.

In assessing Gargus's RFC and the extent to which his symptoms limited his

function, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 7-3 at 15. The ALJ also stated that, where the claimant's statements about the intensity, persistence, or limiting effects of symptoms were not substantiated by objective medical evidence, the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 7-3 at 15.

In determining Gargus's RFC, the ALJ stated that Gargus had submitted an adult function report asserting that he had difficulty walking, climbing stairs, and completing tasks due to chest pain and lack of energy. Doc. 7-3 at 15. The ALJ stated that Gargus reported no problems with personal care, but reported that he did not prepare meals, do housework, or do yardwork. Doc. 7-3 at 15. The ALJ stated that Gargus reported that he could drive a car and handle money, but that his mother handled his finances, and that he did not shop at all. Doc. 7-3 at 15. The ALJ stated that Gargus reported socializing, watching television, and listening to music, and admitted that he did not have problems paying attention, following instructions, getting along with authority figures, or finishing tasks he starts. Doc. 7-3 at 15. The

ALJ stated that Gargus reported that he could walk 20 yards and then needed to rest. Doc. 7-3 at 15.

The ALJ summarized Gargus's testimony from the September 12, 2022 hearing, noting that Gargus said he left work on account of his high blood pressure, which had been a problem since 2020, and that he "has no energy, and just does not feel good." Doc. 7-3 at 15. The ALJ stated that Gargus reported no pain from his arthritis, but that he experienced daily fatigue and weakness that affected his ability to walk more than 30 yards, stand longer than 10 to 15 minutes, "lift or carry a gallon of milk all day," or sit longer than 20 minutes. Doc. 7-3 at 15. The ALJ stated that Gargus reported spending 3 hours resting throughout the day, lives with his mother, spends most of the day lying down or reclining, runs the microwave, cooks a little, watches television, and plays on his phone. Doc. 7-3 at 15. The ALJ stated that Gargus said he could not handle the physical demands of his previous job and could probably lift between 15 and 20 pounds. Doc. 7-3 at 15–16.

The ALJ found that the "preponderance of the medical evidence does not support the claimant's allegations as to the intensity, persistence and limiting effects of his impairments, and his statements are not entirely consistent with an assertion of disability." Doc. 7-3 at 16. In arriving at that finding, the ALJ relied on records showing that, in May 2020, Gargus reported to the emergency department with chest pain, low blood pressure, and dizziness; he was found to have low sodium, so he was

told to drink less water and given saline. Doc. 7-3 at 16. The ALJ noted that Gargus also had elevated liver function tests that could be related to alcohol intake. Doc. 7-3 at 16. The ALJ stated that Gargus was discharged in stable condition. Doc. 7-3 at 16.

The ALJ also found that, at a follow-up visit on September 30, 2020, Gargus reported pain at a level of 0 out of 10, had a normal physical exam, had no shortness of breath, and had no exercise intolerance. Doc. 7-3 at 16. The ALJ found further that, on October 20, 2020, Gargus had normal test results and was assessed with hypertension, atherosclerotic heart disease, and hyperlipidemia. Doc. 7-3 at 16. The ALJ found that, the same day, Gargus reported experiencing chest pain for the previous 3 to 4 days and had fatigue, chest pain, palpitations, dyspnea on exertion, lightheadedness, and shortness of breath, but had largely normal test results showing mild nonobstructive coronary artery disease. Doc. 7-3 at 16.

The ALJ found further that, at a follow-up visit on November 6, 2020, Gargus had normal test results, but reported chest pain and was diagnosed with essential hypertension and referred to cardiology. Doc. 7-3 at 17. The ALJ found that, at an appointment later that month, Gargus reported being relatively active but continued to report "extreme fatigue, weakness, and some chest pain," and said he would "'give out' by the time he would get out of his truck." Doc. 7-3 at 17. The ALJ also found that Gargus's test and exam results were relatively normal and that a stress test was

cancelled because his discomfort was mild.  Doc. 7-3 at 17.

The ALJ found that, in May 2021, Gargus reported having heartburn and said he was "as active as can be"; his blood pressure was "acceptable."  Doc. 7-3 at 17. The ALJ found that, in July 2021, Gargus reported that his blood pressure had been "running high," that he had no energy, that he got short of breath walking to the mailbox, and that he had pain at a 5 out of 10.  Doc. 7-3 at 17.  The ALJ found that Gargus was diagnosed with chronic obstructive pulmonary disease (COPD) and prescribed medication.  Doc. 7-3 at 17.  The ALJ stated that, in August 2021, Gargus's lab results were largely "unremarkable and normal," his blood pressure was normal, and he reported pain first at a 4 out of 10 and then at a 0 out of 10.  Doc. 7-3 at 17.  The ALJ found that, on June 30, 2022, Gargus went to the doctor for a bee sting and denied chronic illness and had relatively normal exam results other than elevated blood pressure; his condition was listed as "stable" later that day.  Doc. 7-3 at 17.

After considering that factual background from the record, the ALJ found that "[t]he above objective signs and findings do not support the alleged severity of restrictions or that the claimant's impairments result in disabling restrictions.  While the claimant may experience some limitations from his impairments, the documentary record does not corroborate those restrictions prevent him from engaging in all substantial gainful activity or substantial gainful activity

20

commensurate with his assigned functional capacity." Doc. 7-3 at 17–18.

The ALJ then addressed medical opinion evidence, finding that Gargus had a normal physical evaluation with a consultative examiner except that his blood pressure was high. Doc. 7-3 at 18. The ALJ found that the consultative examiner diagnosed Gargus with hypertension, arthralgia, hyperlipidemia, gastroesophageal reflux disease, fatigue by history, and alcoholism. Doc. 7-3 at 18. The ALJ found that the consultative examiner did not provide an opinion, but that "the findings on the physical examination support the above residual functional capacity." Doc. 7-3 at 18.

The ALJ found that state medical consultants opined that Gargus could perform a reduced range of medium level work, which the ALJ found consistent with and supported by "the objective signs and findings in the record, the claimant's conservative treatment, and the overall evidence of record," such that the opinions were persuasive. Doc. 7-3 at 18.

The ALJ then found that the record did not support a finding of disability. Doc. 7-3 at 18. The ALJ found that "[t]he facts in the record do not dispute the claimant has physical and mental conditions, which singly or in combination, cause symptoms," but that "the evidence of record does not demonstrate the claimant's symptoms exist at the level of severity alleged by the claimant." Doc. 7-3 at 18. The ALJ found that Gargus "was given the maximum benefit of the doubt in terms of

subjective limitations based on the evidence of record," such that the RFC finding "is supported by the subjective allegations of record regarding the claimant's symptoms and limitations found to be supported by the weight of the evidence of record pursuant to the criteria of SSR [Social Security Ruling] 16-3p."  Doc. 7-3 at 18–19.

The ALJ found further that Gargus was unable to perform any of his past relevant work.  Doc. 7-3 at 19.

At step five, after considering Gargus's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Gargus could perform.  Doc. 7-3 at 20.  The ALJ considered the testimony of the VE and found that Gargus would be able to perform the requirements of representative occupations such as hand packager, machine packager, and porter.  Doc. 7-3 at 20.  Consequently, the ALJ found that Gargus was capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and as a result had not "been under a disability, as defined in the Social Security Act, from January 21, 2021, through the date of this decision."  Doc. 7-3 at 20.

### 4.    Appeals Council decision

On September 22, 2023, the Appeals Council denied Gargus's request for review of the ALJ's March 30, 2023 decision, finding no reason to review the ALJ's

decision.  Doc. 7-3 at 2–6.  Because the Appeals Council found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g).

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.  The ALJ properly assessed Gargus's subjective testimony regarding his impairments and associated symptoms, as the ALJ's decision was based on the multi-part "pain standard," and substantial evidence supports the ALJ's decision not to fully credit Gargus's subjective testimony regarding his symptoms.

## I.    The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard."  When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies.  That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also Raper v. Commissioner of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024); 20 C.F.R.

§§ 404.1529, 416.929 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [his] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard. In analyzing Gargus's RFC, and the extent to which Gargus's symptoms limited his functioning, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 7-3 at 15. According to the ALJ, where the claimant's statements about the intensity, persistence, or limiting effects of his symptoms were not substantiated by objective medical evidence, the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 7-3 at 15.

The ALJ then applied the pain standard test. The ALJ found that "[t]he facts in the record do not dispute the claimant has physical and mental conditions, which singly or in combination, cause symptoms." Doc. 7-3 at 18. But at the next part of the pain standard analysis, the ALJ found that "the evidence of record does not demonstrate the claimant's symptoms exist at the level of severity alleged by the claimant." Doc. 7-3 at 18. The ALJ also found that the "objective signs and findings do not support the alleged severity of restrictions or that the claimant's impairments result in disabling restrictions. While the claimant may experience some limitations from his impairments, the documentary record does not corroborate [that] those restrictions prevent him from engaging in all substantial gainful activity or substantial gainful activity commensurate with his assigned functional capacity." Doc. 7-3 at 18. Indeed, the ALJ also found that Gargus "was given the maximum benefit of the doubt in terms of subjective limitations based on the evidence of record," such that the ALJ's RFC finding was "supported by the subjective allegations of record regarding the claimant's symptoms and limitations found to be supported by the weight of the evidence of record." Doc. 7-3 at 18–19. Thus, the ALJ's decision was based on the proper legal standards.

## II. Substantial evidence supports the ALJ's decision to partially discredit Gargus's subjective testimony regarding his impairments and associated symptoms.

Furthermore, substantial evidence supports the ALJ's decision not to fully

credit Gargus's subjective testimony regarding the severity of his impairments and associated pain and symptoms.

### A.    The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony. *Wilson*, 284 F.3d at 1225.  A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements."    20 C.F.R. § 404.1529(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of his symptoms, the ALJ must consider all of the evidence, objective and subjective.  20 C.F.R. §§ 404.1529, 416.929.  Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, his precipitating and aggravating factors, his daily activities, the type, dosage, and effects of his medications, and treatments or measures that he has to

26

relieve the symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929.

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [his] symptoms."  *See* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar).  "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole."  *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[1]  "The question is not . . . whether [the]

---

[1] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities."  *Hargress*, 883 F.3d at 1308 (quoting Social Security Ruling 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)).  But, generally speaking, a broad assessment of "credibility" still

ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

> **B.    The ALJ properly explained the decision not to fully credit Gargus's subjective testimony regarding his impairments, pain, and symptoms, and substantial evidence supports that decision.**

The ALJ properly explained the decision to partially discredit Gargus's subjective testimony regarding his pain and symptoms, and substantial evidence supports the ALJ's decision.

In his brief, Gargus argues that "the record simply does not permit a reasonable person to conclude the Plaintiff would be able to perform the demands of medium work on a sustained basis." Doc. 13 at 8. Gargus argues that the longitudinal record reveals a history of "debilitating symptoms" of fatigue and lack of energy, and that the ALJ cherry-picked facts supporting the finding that Gargus was not disabled. Doc. 13 at 8–11.[2]

---

can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

[2] Gargus's brief also includes an assertion that the ALJ did not fully and fairly develop the record. Doc. 13 at 12. But that is not correct. An ALJ "has a basic duty to develop a full and fair record." *Henry v. Commissioner of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015). Nevertheless, the claimant ultimately "bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *see also* 20 C.F.R. § 416.912(a) ("[I]n general, you have to prove to us that you are . . . disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled."). And, notwithstanding

However, the ALJ's opinion shows that the ALJ considered the record as a whole, and substantial evidence supports both the ALJ's finding that Gargus's subjective testimony was not entirely consistent with the record evidence, and the RFC finding of medium work with limitations. In arriving at those findings, the ALJ not only articulated and tracked the multi-part "pain standard" (*see* Part I *supra*), but also tracked the Eleventh Circuit law and applicable regulations for evaluating a claimant's subjective testimony (discussed above in Part II.A *supra*).

The ALJ made a clear and explicit finding that the ALJ did not fully credit Gargus's testimony about the intensity, persistence, limiting effects, and general severity of his symptoms. The ALJ provided a detailed summary of the record regarding Gargus's alleged impairments (including heart disease, chronic obstructive pulmonary disease, and hypertension), and considered the medical opinions of the state medical consultants, Gargus's treatment records, and Gargus's testimony about his daily activities, as well as Gargus's adult function report, finding that they were all consistent with an RFC of medium work with additional

---

the ALJ's responsibility to develop a "full and fair" record, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded." *Graham v. Apfel*, 129 F.3d 1420, 1422–23 (11th Cir. 1997). The Eleventh Circuit has instructed that "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Graham*, 129 F.3d at 1423 (quotation marks omitted). Here, there is no basis for the court to find prejudice and the record contains no clear evidentiary gaps. As a result, Gargus has not shown that the ALJ failed to fully and fairly develop the record.

restrictions.  Doc. 7-3 at 14–19.

After providing thorough recitations of Gargus's own testimony and adult function report and his longitudinal medical history, including many generally nonremarkable medical findings, the ALJ identified conflicts between Gargus's testimony and his records, including the following:  that Gargus's liver issues could have been due to alcohol; that at one appointment Gargus reported being relatively active but at the same time continued to report "extreme fatigue, weakness, and some chest pain," and said he would "'give out' by the time he would get out of his truck"; and that at one point Gargus cancelled a stress test because his symptoms were mild.  Doc. 7-3 at 16–17.

The ALJ then explicitly stated that the objective findings in the record "do not support the alleged severity of restrictions or that the claimant's impairments result in disabling restrictions" because, "[w]hile the claimant may experience some limitations from his impairments, the documentary record does not corroborate those restrictions [preventing] him from engaging in all substantial gainful activity or substantial gainful activity commensurate with his assigned functional capacity."  Doc. 7-3 at 18.

The ALJ then focused on the results of Gargus's consultative examination— which were grossly normal—and found that, though the examiner did not submit an opinion, the normal results of the exam were consistent with an RFC of medium

30

work with limitations.  Doc. 7-3 at 18.  The ALJ also considered the opinions of the state medical consultants on Gargus's physical impairments—i.e., opinions that Gargus could perform a reduced range of medium work—and found that those opinions were persuasive as they were supported by "the objective signs and findings in the record, the claimant's conservative treatment, and the overall evidence of record."  Doc. 7-3 at 18.  After considering the consultative evidence, the ALJ found that "[t]he facts in the record do not dispute" that Gargus had conditions causing symptoms, but that "the evidence of record does not demonstrate [Gargus's] symptoms exist at the level of severity alleged by" Gargus.  Doc. 7-3 at 18.  The ALJ also found that Gargus "was given the maximum benefit of the doubt in terms of subjective limitations based on the evidence of record," and that the RFC was "supported by the subjective allegations of record . . . found to be supported by the weight of the evidence of record."  Doc. 7-3 at 18–19.

Accordingly, the ALJ provided an explicit articulation for discrediting Gargus's subjective testimony.  *See Wilson*, 284 F.3d at 1225.

Moreover, the ALJ's decision shows that, in arriving at that finding, the ALJ fully considered the record evidence.  In determining Gargus's RFC, the ALJ stated that the ALJ had considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and had considered any medical opinions and prior administrative

medical findings.  Doc. 7-3 at 15.  The ALJ's decision shows that, in determining Gargus's RFC and arriving at the finding that Gargus was not disabled, the ALJ considered Gargus's testimony and adult function report—including testimony about his "alleged difficulty walking, climbing stairs, and completing tasks," his testimony about only being able to walk 20 to 30 yards before needing to rest, and his testimony about having no energy—as well as his treatment records and the consultative examinations/opinions.  Doc. 7-3 at 15–18.

The ALJ also provided a thorough summary of the record, considering and comparing both the normal and abnormal medical indications therein; for instance, the ALJ found that Gargus had reported to the emergency room with chest pain on multiple occasions and had reported fatigue and weakness to his doctors, but also found Gargus's generally normal test and examinations results, lack of reports of shortness of breath, lack of reports of pain, multiple normal blood pressure readings, and conservative treatment.  Doc. 7-3 at 16–18.  Thus, the ALJ included information based on both objective and subjective evidence and explicitly accounted for evidence supporting Gargus's testimony, but also clearly identified evidence calling into doubt Gargus's subjective testimony about the intensity, persistence, and limiting effects of his symptoms.  *See* 20 C.F.R. §§ 404.1529, 416.929.

Further, the ALJ did not entirely discredit Gargus's testimony, but instead found it partially credible.  In determining Gargus's RFC, the ALJ found based on

the record and Gargus's testimony that Gargus could not perform all levels of work and could not perform any of his past relevant work.  Doc. 7-3 at 19.  Rather, the ALJ found that, based on "the subjective allegations of record . . . found to be supported by the weight of the evidence," Gargus could only perform medium work with additional restrictions.  Doc. 7-3 at 15, 19.  This finding shows that the ALJ's RFC determination did not entirely discredit Gargus's subjective testimony, and accounted for those aspects of Gargus's testimony regarding his impairments and symptoms that the ALJ found to credible based on all of the record evidence.

In short, the ALJ's decision and RFC finding accounted for Gargus's subjective testimony regarding his impairments and symptoms to the extent that the ALJ found that testimony credible, and included the necessary "explicit and adequate reasons" for partially discrediting Gargus's subjective testimony about his symptoms.  *Wilson*, 284 F.3d at 1225.  The ALJ "considered [Gargus's] medical condition as a whole," and the decision was not merely a "broad rejection" of Gargus's subjective testimony.  *Dyer*, 395 F.3d at 1210.

In addition, substantial evidence supports the ALJ's decision not to credit all of Gargus's testimony about his symptoms, because the record supports the finding that there were some genuine inconsistencies or weaknesses in Gargus's subjective testimony, such that the ALJ was not "clearly wrong" to partially discredit the testimony.  *See Werner*, 421 F. App'x at 939.  Because almost all of Gargus's

allegations of disability depended on his subjective testimony, substantial evidence also supports the ALJ's finding, based on Gargus's partially credited testimony, that Gargus could perform medium work with further restrictions.

Gargus's treatment records provide support for the ALJ's findings. The record shows that, while Gargus did often have high blood pressure and report feeling fatigue and weakness (*see* Doc. 7-8 at 69–70; Doc. 7-9 at 20–21, 25, 53, 65; Doc. 7-10 at 19–20), he also frequently reported no pain, no shortness of breath, and no exercise intolerance (*see* Doc. 7-9 at 12, 14, 17, 24, 26, 66; Doc. 7-10 at 15). Gargus also regularly had relatively normal blood pressure readings (*see* Doc. 7-9 at 13–14, 18, 50; Doc. 7-10 at 13), and generally had grossly normal test and examination results (*see* Doc. 7-8 at 11, 56–57, 71; Doc. 7-9 at 54, 67–70). Radiologic testing revealed only some mild nonobstructive coronary artery disease but was otherwise normal. Doc. 7-8 at 98–100. Even when Gargus complained of extreme fatigue and weakness, Dr. Reeder, a cardiologist, noted that Gargus was in his "usual state of health" and had been "relatively active," though he did not exercise routinely, and Gargus asked to cancel a stress test for cardiac health. Doc. 7-9 at 53–54. Gargus also reported to Dr. Wilson in May 2021 that he was "as active as he can be," and Dr. Reeder recommended "[s]ymptom-limited activity." Doc. 7-8 at 71; Doc. 7-9 at 50. When Gargus reported to the hospital for a bee sting in 2022, he denied chronic illness and any symptoms other than high blood pressure and those

related to reaction from the bee sting.  Doc. 7-10 at 31–33.  Gargus's treatment records also indicate that at least some of his medical issues may have been attributable to alcohol use.  *See* Doc. 7-8 at 20, 70, ; Doc. 7-9 at 12, 17–19, 68; Doc. 7-10 at 15.

Gargus's own statements and hearing testimony also provide support for the ALJ's finding that Gargus was not disabled.  Gargus stated in his adult function report that he was able to take care of his own personal care without difficulty, could drive and go out, was able to socialize, and did not have trouble with people or finishing things he started.  Doc. 7-7 at 35–38.  Gargus stated in his function report that his mother took care of most things around the house, but it was not entirely clear whether that was a matter of necessity.  Doc. 7-7 at 35–36.  For instance, he stated in his function report that his mother cooked all of his meals (Doc. 7-7 at 36), but also testified at his hearing that he could use the microwave or cook if he had a chair (Doc. 7-3 at 42).  Gargus also testified at the hearing that his only real limitation was fatigue, and that he was not receiving medical treatment.  Doc. 7-3 at 41, 43.

In sum, ALJ properly concluded that the record contains little evidence— other than Gargus's own subjective reports of his experience of fatigue—that would support a finding of disability, and contains evidence consistent with relatively normal health and ability to function.  As a result, the record includes sufficient facts inconsistent with the alleged severity of Gargus's limitations to support the ALJ's

RFC determination and finding that Gargus was not disabled. Gargus argues that the ALJ cherry-picked from the record to support a finding of no disability, but that argument cannot overcome the evidence supporting the ALJ's decision and the clear indications in the decision that the ALJ considered the record as a whole.

As explained above, substantial evidence requires "such relevant evidence as a reasonable person would accept as adequate to support a conclusion" (*Crawford*, 363 F.3d at 1158); and the court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the Commissioner's findings" (*Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529)). Although Gargus has pointed to evidence supporting his position, he has not shown the absence of substantial evidence supporting the ALJ's decision. Under a substantial evidence standard of review, "[a plaintiff] must do more than point to evidence in the record that supports her position; she must show the absence of substantial evidence supporting the ALJ's conclusion." *Sims v. Commissioner of Soc. Sec.*, 706 F. App'x 595, 604 (11th Cir. 2017) (citing *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991)).

This court cannot reweigh the evidence (*see Winschel*, 631 F.3d at 1178); and there is sufficient evidence in the record based on which a reasonable person would accept the ALJ's findings that Gargus's subjective testimony regarding his symptoms was not consistent with the record as a whole, and that Gargus was not

disabled (*see Crawford*, 363 F.3d at 1158).   Accordingly, substantial evidence supports the ALJ's decision.  In this regard, the ALJ clearly articulated a credibility finding that was supported by substantial evidence, and as a result the court cannot disturb that finding either.  *See Foote*, 67 F.3d at 1562.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the Commissioner's decision is **AFFIRMED**.  The court separately will enter final judgment.

**DONE** and **ORDERED** this February 27, 2025.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE